Good morning, Your Honors. Dan Bridges for Gail Michelman. This is an appeal of several district court orders, principally a summary judgment issue. I'd like to start off by sort of an overview and suggest that there has been what I would call an inaccurate characterization of what Gail's claim really ever was and what her position was on summary judgment. So let me be as clear as I can. Gail has never contended that a carrier, life insurance carrier, really substantively resolved the merit of competing claims before interpleader. She has never asserted that. I suggest the life insurance company has argued that, and it seems as though that trickled into some of the district court's orders. Instead, her argument is different. Her argument really raises two issues. First, what type of claim even gives rise to the ability to interplead? Is it any type of claim demanding payment of the res, or is it something else? And second, what quantum of evidence is required before, assuming that the right type of claim is made, whether it provides a reasonable basis for an interpleader? So I think that the first place to start with, of course, is what is interpleader? And I'm not going to lecture you on that. You are well-versed. However, I will simply frame the issue. Under FRCP 22, you know, claims of interpleader are limited to claims where, quote, persons having a claim against the plaintiff, the stakeholder, may be made. I think that's informative, and I think it's also informative if you look at the Nkeise case. Now, that's the Nkeise case versus USAA, and I apologize if I'm butchering the plaintiff's name on that. The claim must be one that can actually be made against, in this case, the insurance company. That is the only type of claim that calls into question the stakeholder's right to who to pay. If it's merely a claim that is really a misguided claim of, well, the insured owes me money, pay that money to me directly, that is not the type of claim that forms that proper basis for interpleader. That is the USA case that I'll call the USA case instead of the Nkeise case, straight up. So to bring us back to the first issue, what type of claim is required? It must be a claim that actually calls into question the duty of the carrier as to who to pay. If the carrier has a reasonable good faith basis as to who its obligation is to pay, well, then by all means, interpleader is absolutely appropriate, and we have never claimed otherwise. But if it's not the type of claim that calls into question that duty, there's no ability to interplead. Mr. Bridges, are you familiar with the Mack v. Kuchenmeister case? I can't say I have an understanding of it. It's a Ninth Circuit case that came down approximately two weeks after Judge Lasnik's decision in this case. And it states very clearly regarding interpleader, briefly as follows, the purpose of interpleader is for the stakeholder to protect itself against the problems posed by multiple claimants to a single fund. This includes protecting against the possibility of court-imposed liability to a second claimant where the stakeholder has already voluntarily paid a first claimant. But it also includes limiting litigation expenses, which is not dependent on the merits of adverse claims, only their existence. Doesn't that statement of the purpose of interpleader seem to be fairly broad? Only their existence? I would agree it's a broad statement. But I don't think it's an incompatible statement with what I'm arguing with you right now. And the reason is it still begs the question of what is the type of claim that is called into existence? Also, I would suggest it's inconsistent to some extent with an insurance company's first-party duty of good faith. And I'm going to talk about that in a second and be responsive to that question in a moment if I can. Can I ask, I mean, maybe this is what you're going to talk about, but what do you believe Lincoln's responsibility was upon receipt of Irwin's communication about the insurance policy? Right. I respect the fact we're in the United States courts, but we are still in the state of Washington. And the substantive law of the state of Washington applies in regard to their obligation to their first-party insured. And in that regard, the Washington Administrative Code is clear and applies equally to life insurance companies. They had an obligation to perform a reasonable investigation of fact as to the matter at hand, which in this case was the claim. Now I think the difference here, because we have a life insurance claim and we have the concept of interpleader, it does not require the carrier to definitively resolve which claim has the greatest merit. I've never claimed that. But what it does require, no different than the Alaya v. Best Food case, it does still require a good faith basis, in fact, for every decision the carrier makes. So here, especially when you have an insurance company, the carrier must have a good faith basis in fact that the claims being made may actually be made. In other words, if you look at the claim file and you look at the adjuster's own notes, there were two phone calls that were made. And on the basis of that, Lincoln decided to file interpleader. There was no investigation conducted. There were no facts at all. Well, there was also an initial application by Irwin in which it was somewhat ambiguous who the owner of the policy was. Well, the district court found that it wasn't ambiguous and that has not been appealed. So the district court found that it was clear based on the way Irwin completed his own application, he was only ever a contingent owner, that Gail properly changed the beneficiary using Lincoln's own forms and Lincoln acknowledged that. So if there was any ambiguity, it was in the fact that Irwin did not submit what were called those supplemental instructions. But the court found there was nothing unclear about who had the right to change the beneficiary. And I don't mean to use a cop-out, but in terms of what's before this court right now, that finding has not been appealed. Actually, the court in a footnote, I think, said, I'm not going to rule on what would have happened if Irwin had brought his claim earlier that Gail did not have the right to dispose of his 50 percent of the tenancy in common. Yes, but I would suggest that's on a different issue. That's talking about the issue you're talking about right now, which is different than the fact that Gail was the primary owner. I understand. There was some issue that he was listed as a owner initially, but that he was also listed as a beneficiary. What I'm talking about goes to the... Exactly. But as we all know, a beneficiary has no vested right. And that's what the court found. I mean, until the right vests, you have a contingent interest in the policy. Gail was the owner and had the right to change the beneficiary. What the trial court was actually talking about was whether, as a contingent owner, Irwin had any right to notice of Gail's changing the beneficiary. What the district court also noted, however, is that under the plain terms of the policy, either of the owners could have changed the beneficiary. So there's really no question, I suggest, in terms of what Lincoln's own policy tells Lincoln its obligation to do or what Gail's right was to do, especially when we get to the time of the actual death of the insured life. Are you suggesting that Gail did have the right to change the beneficiary without Irwin's consent? The policy on that, I suggest, is clear, yes. And I would also point out to Your Honor that that was never used as a basis by Lincoln for its interpleader. And the fact that the district court pulled that out, it was never a reason for the interpleader. There were only three reasons listed for the interpleader. I'm going to discuss those in a second. Well, one of the reasons was, I think, Irwin also stated in his letter that community property asset of the marriage as an issue and that was not awarded to either party in their divorce. So, I mean, I think Irwin did identify that as an issue and basically saying they both owned it. So that raises the color. I mean, it seems like that's what he was saying. Well, under Washington law, if it's not listed as asset in the divorce, it's a tenancy in common. Correct. And so his position, I think, from the outset was that his half of the tenancy in common was disposed of without his consent. Well... And that he did not know of it. I mean, ultimately, he didn't show that he lacked knowledge, but his initial claim was that he could not know of it. Well, I can't disagree with any of the facts you're just stating in terms of evidentiary facts. But what is missing is the context, which is that these people had two daughters and that basically what happened was they split up the life insurance policy. Irwin got one policy, Gail got the other policy. I mean, those are the other facts that were in the record. And with that knowledge going forward, they disposed of these policies as they saw fit. The other important factor, which I know you're aware of it because it's in the record, is that this policy by Irwin's own handwriting was gifted to Elizabeth when she turned 21. And she had already turned 21 before she died. And so the other important issue here is that these arguments that Irwin was making only after she died, frankly, were legally moot and impossible because he had no interest in the policy anymore. When she turned 21, both he and Gail were divested of ownership. If I can, I'd like to... Well, didn't that also partly turn on the issue of fact as to whether Elizabeth was aware of the beneficiary designation? There was no question of fact below. There was no question of fact of that at all. So, I mean, if you ask me if there was a question of fact, no, there was not. The undisputed evidence was that Elizabeth was aware of the policy change and didn't change it. And furthermore, under Washington law, a person in that situation is deemed with constructive knowledge to know the status of the policy. So even if we didn't have evidence of her actual knowledge, her constructive knowledge is sufficient. If I could, there are two points I'd like to make before I run out of time. I'm already down to four minutes, if I may. The policy itself, I suggest, addresses two of Irwin's claims at page nine of the policy, which is in the appendix, or pardon me, in the exhibits 323. It deals with claims of creditors. And Lincoln, in his own policy, promises that the proceeds will not be subject to any claim by a beneficiary's creditors. That's at page nine of the policy. These arguments that Irwin is making really are creditor claims. That I had an agreement with Gail, and by her changing as beneficiary, she has breached that agreement with me, so paid this money directly to honor her agreement. That is really what this is all about. None of his claims really call into question the carrier's own duty. Mr. Bridges, may I ask you a question? I'm sorry, I didn't mean to step on your line there. Yes, Your Honor. One of your arguments is that they didn't investigate Irwin's claim properly. Had they done so, they would have found them to be bogus, basically. Is that right? I think that's a fair statement, Your Honor. Okay, can you tell me what they did do, and what should they have done? They didn't do anything, and that's undisputed. When you look at the claim log, you get two phone calls from Irwin, you get a letter from his attorney that is not fact, it's the argument. And in the claim log, it says they made the decision to interplead. And what's interesting is, Your Honor, is that they made the decision to interplead a month before even telling the beneficiary of the policy that. So, they did nothing. Did they get a copy of the divorce decree? Did they request a copy of the divorce decree? That was all after it made its decision. They'd already made the decision to interplead, and there are two important facts I'd like to consider on that. The adjuster, and this is cited in the brief, admitted that she didn't care about those facts, she wouldn't have asked for the divorce decree, except that Gail asked her to ask Irwin for his proof. The adjuster admitted a deposition, just the allegation alone was enough. The adjuster admitted a deposition, that she wouldn't have done anything more, except Gail was on her, please ask him for his proof. That's the only reason why Lincoln has any of that information, as well as the information Gail provided. But again, I stress, that's only after it made its decision. And didn't it come out, I don't know if it was through this adjuster or not, that that's the way this company always did this? Yes, and I was shocked. I had, not simply the adjuster, but I had the vice president in charge of claims, who deals with training, and she admitted, she could not recall for the last 10 years a claim they have not interpled, merely on the fact of the allegation. If I can, I only have two minutes, and there's one point I'd really like to articulate to you, because I think this is the whole case, this one point. All they had to do was investigate and determine if there were any facts to color the claim. And that's consistent with the Lee versus New York Life Insurance policy, that's consistent with the authority, I realize Amadure isn't buying authority, but it's a reasonable compendium, reasonable with what Amadure explains, which is there must be some fact to color the claim. Here, what Lincoln did was they confabulated the fact of a one-page letter, three paragraphs, articulating three things, which were the divorce decree said there could be no change, the parties had an agreement, and that death was being investigated as a possible homicide. Those were the three arguments that Lincoln used to interpret. To be clear, I am not saying, and I've never said, that Lincoln had to determine the ultimate truth of those claims, or that Gayle's claim was more meritorious. But it had to investigate to determine there were any facts to support those claims at least, to at least color the claims. And it didn't do that. And what Lincoln basically said is, is interplead, no harm, no foul, we're going to walk away from all of our duties of first party good faith to investigate and communicate with our insurance company. And with respect to the ownership, though, didn't the company already know that there was this whole problem with who owned it at the time that the beneficiary designation change was made? Your Honor, there was never a question of ownership, frankly, until the judge raised it in his footnote. But I don't know that that's necessarily accurate. If Irwin listed it as an issue that it was their property together. Well, what Irwin said was the divorce... I'm sorry. It seems like the ownership issue flows from that. But what his actual complaint was that the divorce decree said no change could be made. That was his complaint to Lincoln. And that's what Lincoln used to make his decision for the interpleader. All I'm suggesting is Lincoln's obligation was not necessarily to go out and have a deck action to resolve those questions. Lincoln's obligation was to get the darn divorce decree and look at it and see what it actually said. It didn't do that. It simply made the decision based on Irwin's phone call. It made the decision based on the attorney's letter that the death was being investigated as a homicide when plainly it wasn't. It didn't require the insurance company to resolve whether there was a homicide. It just required to get a copy of the death certificate. And it didn't even do that. So are you asking us to reject the breadth of the language in the MAC decision then? I think that the MAC decision comes up against a certain wall when you have a first-party insurance claim. I don't think it's a rejection. I think it's a reconciliation. I think that all you have to do is say, look, an insurance company does have to satisfy itself. There are at least some facts to call the claim. I don't think that's asking to do new law. I think that's been the law in Lee versus New York life for a very long time. And if there are any facts, then Lee comes into play. But two phone calls and one letter with no facts is not sufficient. And that's all I'm suggesting, Your Honor. This is responsive to your question. Thank you very much. Thank you, Your Honors. Thank you. Good morning, Your Honors. Good morning. Medora Morris on behalf of Respondent. I do want to clarify that at the trial court, Ms. Michaelman did argue repeatedly that, in fact, the actual obligation to determine who to pay was what the insurance company's obligation was. And I point you to ER 11 footnote 2 citing her declaration saying just that. I'm sorry. Who? I'm sorry. That was Gail Michaelman's declaration, docket number 83. And it's cited in the court's opinion, ER 11. Here, plaintiff is arguing that asserting a colorable claim is not enough. That the insurance company has to have enough. No, no. You misunderstood. No, he said a colorable claim is enough. You didn't, they didn't assert a colorable claim. That's what he says. Well, he actually, in his reply brief, I think it's at page 20, says a colorable claim isn't enough. You have to have now facts. You have to have facts to support that claim to see if it, in fact, will be justified. Let me ask you this. What did the company do to investigate Irwin's claim? The company received a phone call immediately after being notified by the death from Irwin that there was a fraud in the beneficiary. So it's on, it's got some notice about something, whether it's valid or not. It then gets a letter. I'm sorry. What did they get? They had a phone call from Irwin Michelman, who was claiming that there was fraud in the beneficiary. Okay. They then received a letter from Irwin Michelman asserting that he had a community property interest because he was a co-owner of the policy. And under Washington community property laws, he had not been provided notice of Gayle's change to the beneficiary. He also asserted that in their divorce proceedings, they had a verbal agreement that they would split the beneficiary proceeds and so that they would each be 50-50 beneficiaries. And that he was not notified that Gayle subsequently after the divorce changed the beneficiary designation to herself and took him off the beneficiary designation. They also received a letter from Mr. Michelman's attorney who asserted that the same argument, that there was a community property interest that is being violated by the beneficiary designation. And so the issue here, it's not a side agreement. My question was, what did they do to investigate this? Okay. I'm still going. So they got the letter from Irwin Michelman's attorney who said that the divorce decree did not award the policy as separate property. It was silent. And because it was, therefore it was community property, and so they were taken as tenants in common. And they then sent a letter to Gayle Michelman. This is October 12th. They were still waiting for her to send in her claim form. And the next thing that happened also was that Irwin Michelman sent in a claim asserting his right to the policy proceeds. They then sent a letter to both Irwin and Gayle saying that it appears that there's competing claims here and we will intend to interplead this. Gayle Michelman then sent in the divorce decree and it completely corroborated what Irwin Michelman's attorney had said, which was that the policy had not been awarded as separate property. There was no evidence during the claim of Elizabeth's intent when counsel was saying there was no dispute of fact. Well, that was on summary judgment because Irwin Michelman had asserted cross-claims. His attorney had, under Rule 11, said that there was a good faith basis for, in fact, in law for Irwin's claims. And he had asserted a cross-claim against, or a counter-claim against Gayle. And so the finding of no facts to support over his claims was on a summary judgment motion. That wasn't during the claims process. And then there was a dispute about a side agreement, a verbal side agreement that each party said, both parties were not agreeing as to what it said. So I'm still having a hard time putting my finger on what the company did to investigate. You've told me they got phone calls and they got letters. I'm not sure what it is the company did. And they got the divorce degree. And they got the death certificate. And they got the coroner's report. And they got subsequent letters from Irwin Michelman's attorney. The letter from the lawyer makes a reference to the death being suspicious. Would that have been enough to interplead the funds? Well, it would have to implicate the who to pay, the duty to pay. Right. It didn't do that. It said that the death was being reopened as a homicide under suspicious circumstances. It doesn't say who the suspect was or anything like that? Correct. Correct. So the company did not even cite that in its letters to Gail in support of the decision to interplead. Did the company investigate the fact that once Elizabeth turned 21 she was the owner of the policy as a matter of law? Did they investigate that? I'm not sure there was any investigation to do. The issue was not whether she was the owner as a matter of law. The issue was ratification. Did she know that she was the owner? Did she know who the beneficiaries were? Did she know that her parents had come to this alleged side agreement? None of that was submitted during the claim. There seem to be cases that say if there's a side agreement that is between the two parties to the agreement and it doesn't affect who gets paid the benefits. Did they look into that at all? The issue, Your Honor, in this case was directly implicating the duty to pay because Erwin was not seeking to enforce a side agreement. He was saying we had a side agreement which distributed the community property. By Gail changing the designation she has violated my community property rights. And so the designation itself is ineffective. He directly attacked the designation. This is not a situation where there's a claim of a creditor. I submit that this case is very, very much like the Ensley case. In the Ensley case there was a husband and wife. The wife was eventually made the owner of the policy and the beneficiary. The husband went to jail and the couple were divorced and there was issues about who owned the policy under community property. And because the divorce actually happened, it wasn't finally effective until after the insured had died. The insured had been reverted back to the owner and he made his brother the beneficiary. And so it was almost on all fours in terms of the facts and the court had no problem at all finding that in that case there were sufficient competing claims. Because the third prong of the test under Rule 22 is that the asserted claims may expose a stakeholder to double or multiple liability or multiple litigation. And what the plaintiff is trying to do in this case is to require stakeholders, and I guess he's arguing for a special rule for insurance company stakeholders, to not only take those claims but to start to question the veracity of each claimant and to go out and affirmatively gather facts and evidence. And I submit in this case, other than taking depositions, which this insurance company had no ability to do because there was no subpoena power, it had no ability to gather facts other than just asking questions. Well, but I'm not sure that it's unreasonable to raise this issue when you have a claim adjuster from your company and other audits that suggest that all that is needed is for someone to make an allegation that they're entitled to some money or call it into question. And I think that's an issue here and that's what I'd like to explore with you because is it your company's policy, as was suggested by the adjuster, that anytime anybody raises anything, we submit it to interpleader? No, Your Honor, that's an overstatement. What the actual testimony was is that they do not decide the merits of the claims nor do they get into the credibility evaluation of the different claimants. And in fact, I think this really gets to the very sound rule that the Federal circuits have repeatedly made, which is the claims don't have to be meritorious in order to give rise to an interpleader. You can't deny interpleader when there's multiple liability and resting on even tenuous grounds. What there has to be is a colorable claim. In other words, if there was truly, if this was a stranger to the policy, of course he's not, he's a father, if he had no interest at all in the policy proceeds, so that you wouldn't have to construe facts, you wouldn't have to go out and investigate, you wouldn't have to make conclusions of law to reach the conclusion that in fact he's not entitled. Would you agree that it has to be at least a colorable claim on the policy? In other words, if they say there was some extra-contractual agreement between Gale and Irwin, that wouldn't affect Lincoln's obligation under the policy. That would be a breach of contract between Irwin and Gale, right? And I think that's exactly what we had here, because he was attacking her designation based on community property. Now, community property is, I suppose, extra-contractual to some extent, but it's not dependent on a breach of contract. Is it Lincoln's argument, then, that if, in fact, it was an improper designation of Irwin's property, that even if Elizabeth gained majority and did not change the beneficiary designation, that that designation was invalid a priori, because it should never have been changed to begin with? That certainly could have been a remedy that the court could have imposed, and that's why there was a series of steps that the plaintiff is asking the stakeholder to go through, that the trial court had to go through on summary judgment. That's how far this went. And it couldn't make any of those steps without exposing itself to the potential, the possibility, not the probability, but just the possibility of a colorable claim. And the reason why Irwin had a colorable claim is that he was attacking the designation because he said he was a co-owner, which, it was ambiguous under the policy. There was no place to put joint co-owners. There was a contingent owner and a co-owner. So he was arguing that he was a co-owner and that he had the right to notice and that Gail had no ability to change the beneficiary designation. What was the status, do you know, of Gail and Irwin regarding ownership? The status of Gail and Irwin? And Irwin regarding the ownership. I think it's unclear. I think they're either contingent, either she's the primary owner and he's a contingent owner or they're co-owners. He checked the box joint ownership. Well, so, but it's your company who made the form and created, I guess, that ambiguity because the way that you have it written, you have, you know, the primary owner, I guess, then contingent, or primary beneficiary and then contingent beneficiary, and then you have a box that says they were both joint owners. Well, the ambiguity actually wasn't because of the form. The ambiguity, when you check joint owners, you were supposed to then have submitted a separate schedule which didn't get submitted. Well, actually, Irwin said the reason why he didn't put his name as one of the primary owners was there was no place on the form for him to put his name. So he put his name on the contingent owner line, but then he checked co-owner. Right. So you're not saying he is a joint owner. You're saying there was ambiguity about whether he was a joint owner. You know, I don't know that that has been resolved. In the summary judgment motion, I think the court assumed that he was either a contingent owner or a joint owner. Oh, but then why did Lincoln execute Gale's change in beneficiary if he was a joint owner? They got a request from an owner to change the beneficiary. So one of the two joint owners can change the beneficiary designation unilaterally? That's possible, and that's just like happened in the Ensley case. In the Ensley case, they also changed the ownership back to the original insured, but yet they were still allowed to interplead. Because? Because the claim, there was a, in fact, in that case, the prior owner, the ex-wife, hadn't even filed an adverse claim. But there was enough there to suggest that there was a culpable claim that could have put the company at risk for double or multiple liability. And in here, we have a situation where not only could it have resulted in that, but we have Irwin, through his counsel, submitting a counterclaim and going all the way to summary judgment before it could finally get resolved. And so are you saying here that we, the company, assessed what came in and saw a culpable competing claim, so we went to court to interplead? Or are you saying we saw a competing claim, so we went to court to interplead? It was a culpable competing claim. Their process... So you made an assessment and said there was a culpable competing claim? A legal assessment. The process is to submit it to the in-house legal department who made the decision. And what was, tell me, what was that decision? I mean, how did they arise at that decision? That there was a culpable claim because of the community property issue and because of the lack of the many, many legal hurdles that you would, and factual hurdles that you would have to get to, to find that Elizabeth actually ratified the policy. There's not even any evidence at the claim stage that she even knew she was, you know, who the beneficiaries were. And so, you know, and she's deceased. So the only way to take that evidence would be to ask Gail and ask Irwin. I guess, do you still have this form? Are they still using this form? I don't know. Do you see the irony here? Because here, you know, someone says they're going to change. The insurance company says, okay, you're listed as an owner so you get to change. And now you're saying, oh, there's a question about ownership. And so we're going to interplead. Well, that happens all the time when people challenge, especially due to divorce, where people challenge the ownership and what the ownership, what they're entitled to do during that ownership. And so, you know, the fact that Irwin challenged that, I think is not outside the norm at all. How about the fact that Irwin knew about this for seven years and then waited to challenge it until this came out? Does that matter? It mattered, you know, once you're at trial, you know, and you can have motions and briefing and depositions and subpoena power, it matters. But during the claim phase, it was a colorable claim. And to go out and evaluate that and determine, oh, well, that would be a violation of statute of frauds. Maybe, maybe not. Could it have been performed within one year? You know, probably someone can come up with a case that suggests otherwise. So I think that to put those burdens on a stakeholder would directly violate the Tashier case, which says, that's the Supreme Court that says interpleader is to be liberally construed. Obviously, the Mack case that Your Honor is familiar with reiterates that rule. There's multiple policy reasons for interpleader and they're all met in this case. This is not even a close case. Irwin, Irwin was directly challenging the beneficiary designation. The law is very clear that all you need is a colorable claim and he had a colorable claim. You don't need to go out and investigate the veracity of that claim, whether it could stand up to a summary judgment. You know, interestingly, Gale did not get this case dismissed or Irwin's claims dismissed on a motion to dismiss. She had to go through deposition of Irwin and do summary judgment before that was able to get dismissed. Thank you. Thank you. Thank you. I'm sorry, if you had any time left. Okay, I'll give you two minutes. There are four points I'd like to make really quickly, if I may. Counsel's argument is very cogent, but it's just not supported by the record. The idea that there was some process that she just got to describing to you is simply not in the record. There's no production, despite me asking for the full underwriting and claim file, any type of legal analysis where they actually looked at any of these arguments they're now making. Your Honors, the record is clear and it's at page 275 of the record. They made the decision to interplead based on Irwin's two phone calls and the letter, so while she tries to justify what they did by what they know now after the fact, because Gale gave them the information that they wouldn't ask for themselves, that was not the basis of the interpleader decision. It was plainly simply the phone calls. The case law kind of vacillates sometimes. Sometimes they call it a colorable claim, sometimes they call it something else, but I think the intent of what I'm trying to explain here is clear. Simply giving voice to there's a divorce decree or giving voice to there's a homicide investigation is not what is required, especially when an insurance claim is involved. There must be at least some facts. It does not require determination of those facts, but it does require the presence of those facts and they cannot divorce themselves from their own claim law. Bosco, which is a Washington State case that deals with insurance, Estoppel says that specifically, they cannot claim the benefit of facts they only learned later once they made their coverage decision. Here they made their decision later. They didn't make a coverage decision, they made a decision to interplead, but they did have the divorce decree in hand at the time they did it, didn't they? I don't want to get bogged down in semantics in terms of whether it's a coverage decision or not, but I suggest to you that when a carrier decides to compel their first party insured to a year of litigation and $50,000 in costs for not paying who even they acknowledge to be the rightful beneficiary, they've made an important decision. I suggest it's a coverage decision. Did you feel that Irwin's claims were frivolous? Well, the short answer is yes, but I don't think that's really the question before this court. The question before this court, were there any facts that Lincoln had to support even the frivolous claims? And the answer is made clear by its claim law, which is it didn't. Well, the question I wanted to ask following up on that is if you thought that Irwin's claims were frivolous, why did you not in the motion for fees ask for some of the fees to be shifted to Irwin? Because there comes a point when you're in litigation where you've been shut down on three motions already and I'm trying to extricate my client with the least amount of cost and time possible. That's the bottom line to that. Irwin, even if I got the order, it'd be like squeezing blood from a stone. It'd be an order with no point, so why take the time? I mean, that's really what the genesis of this whole fight was. He needed the money. Now, it's not on the record, but if you asked me the question tactically as a lawyer why I didn't bother asking for fees, I'd never collect them from him. It'd just be a hollow order. Now, if I can just say one last thing because you asked me the question, so I think I'm over even my two minutes. You asked counsel what the policy is to investigate, whether there is a policy. She said, oh, no, there's a policy. We investigate these things. We just can't go out and determine facts. Your Honors, it's at page 955 of your record. Question, what is your understanding of who within that organization has the responsibility to investigate death claims? Answer, no one at Lincoln investigates the claim. I mean, that's the actual testimony. I think the record here is pretty clear that this company made a decision based on two phone calls and a letter with no facts. And they learned facts later. But the claim log, I mean, that's why under the WACs they're required to keep a claim log of every important thing that happens, and just look at the timeline. They didn't have any of those facts when they made their decision. They made their decision first. I don't think I'm asking you to turn upside down interpleader. I'm just asking you to mesh the first party obligation that exists in the state of Washington with interpleader, and I don't think any court has really taken that head on yet. I'm asking you to do so. Thank you. Thank you. Thank you. Thank you, Your Honor. All right. The case is submitted. Thank you both for your argument today. We will be in recess. Thank you very much. All rise. This court's discussion stands adjourned.
judges: Gee, Silverman, Murguia